# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH DAKOTA

### WESTERN DIVISION

---

**ELIZABETH LONE EAGLE; et.al.,**

Plaintiffs,

v.

**SOUTH DAKOTA BOARD OF MINERALS AND ENVIRONMENT; SOUTH DAKOTA DEPARTMENT OF AGRICULTURE AND NATURAL RESOURCES; BOB MORRIS, in his official capacity as Hearing Officer; DAVID McVEY, in his official capacity as Legal Advisor to the Board of Minerals and Environment; MIKE LEES, in his official capacity as Minerals, Mining, and Superfund Program Administrator; HUNTER ROBERTS, in his official capacity as Secretary of the Department of Agriculture and Natural Resources; and CLEAN NUCLEAR ENERGY CORPORATION, as Real Party in Interest,**

Defendants.

Case No.:  5:26-cv-5068

---

## VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE AND DECLARATORY RELIEF

(Civil Rights — 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Fourteenth Amendment to the United States Constitution; S.D. Const. art. VI, § 2; Americans with Disabilities Act, 42 U.S.C. § 12132; Executive Order 13166)

---

## I. INTRODUCTION

1. This is a civil rights action arising from the systematic, ongoing, and deliberate denial of meaningful participation to Lakota first-language speaking pro se intervenors in a quasi-judicial state administrative proceeding — Clean Nuclear Energy Corporation's uranium exploration permit application EXNI 453, currently before the South Dakota Board of Minerals and Environment — a proceeding that directly threatens the land, water, cultural sites, and sacred landscapes of the southern Black Hills and the Lakota people whose lives and communities are bound to them.

2. **This action is an emergency.** The hearings in EXNI 453 commenced on **May 18, 2026**. Today, **May 20, 2026**, is **day three** of a scheduled five-day evidentiary hearing. Lakota first-language speaking intervenors are present. The injuries described in this Complaint are not historical. They are happening at this moment, in real time, in a federal judicial district less than an hour from this courthouse.

3. Due process does not mean merely allowing a person to sit silently in a room while proceedings unfold in a language they cannot meaningfully understand. Participation without comprehension is not participation at all.

4. The exclusion occurring here is not theoretical. It is active, ongoing, and visible on the face of the proceedings themselves. Every witness examined without adequate interpretation, every exhibit introduced without translation, every procedural ruling issued without comprehension, and every deadline imposed without meaningful language access compounds an injury that cannot later be undone.

5. These failures are not the result of a novel or unforeseen situation. Beginning in **August 2025** — nearly ten months ago — Plaintiff Lone Eagle provided Defendants with a detailed, specific implementation plan, budget framework, interpreter qualifications, logistical roadmap, and legal authority for Lakota language interpretation and translation services. She resubmitted and refined those materials repeatedly through April 23, 2026. On day two of this hearing, state officials represented to the hearing chair that this situation is "new" for "everyone" and that they are "trying to figure it out." That representation is false on its face and is refuted by the documentary record.

6. On day two, May 19, 2026, Defendant McVey represented on the record that the Board had approved *interpreter* services in accordance with HB 1219 but had not approved *translation* services. That representation is directly contradicted by the Board's own official meeting minutes of March 18, 2026, which caption the relevant section **"Translation Services"** and record the 8-0 vote to overturn the Hearing Officer's denial and provide those services. Defendant McVey's semantic distinction is not supported by the record. It is contradicted by it.

7. The harm from that ten-month denial is not merely prospective. Because interpretation and translation services were withheld from August 2025 through the eve of the May 18, 2026 hearing, Lakota-speaking intervenors missed every single pre-hearing deadline established in the September 2, 2025 Scheduling Order — without accommodation, without extension, and without relief — despite Plaintiff Lone Eagle's explicit, documented requests that those deadlines be adjusted to account for the language access failure. Those deadlines are permanently passed. The pre-hearing record was built without them.

8. Plaintiffs bring this action under 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the Fourteenth Amendment to the United States Constitution, S.D. Const. art. VI, § 2, the Americans with Disabilities Act, 42 U.S.C. § 12132, and Executive Order 13166, seeking emergency injunctive relief to stop the ongoing constitutional violations and ensure that the remaining days of the EXNI 453 hearing are conducted with meaningful language access for all participants.

## II. JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

10. Venue is proper in the Western Division of the District of South Dakota pursuant to 28 U.S.C. § 1391(b), as the events giving rise to this action are occurring in Fall River County, South Dakota, and the ongoing hearing is being conducted in Hot Springs, South Dakota, within this division.

11. This Court has authority to grant the injunctive and declaratory relief requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 65.

12. Immediate judicial intervention is warranted under **SDCL § 1-26-30**, which provides that preliminary, procedural, or intermediate agency actions are immediately reviewable where review of a final decision would not provide an adequate remedy. No adequate remedy exists here. The hearing is proceeding now. The constitutional injuries being suffered by Plaintiffs during each day of the hearing cannot be restored on appeal.

## III. PARTIES

### A. Plaintiffs

13. **Plaintiff Elizabeth Lone Eagle** is a pro se intervenor in EXNI 453, residing at 7958 Lakota Prairie Drive, Apartment 53, Kyle, South Dakota 57752. She is a second-language Lakota learner. She has participated in the EXNI 453 contested case proceedings since their inception, filed numerous motions regarding language access and due process on behalf of

herself and other Lakota first-language speaking intervenors, and submitted written memoranda to the Governor, the Attorney General, the DANR Secretary, and the Board Chairman documenting the constitutional failures described in this Complaint and demanding corrective action before the hearing commenced.

14. **Plaintiff Helen Red Feather** is a pro se intervenor in EXNI 453 and a Lakota first-language speaker residing in Wounded Knee, South Dakota (P.O. Box 173, Wounded Knee, SD 57794). It was her testimony, delivered in the Lakota language at an August 2025 hearing without interpretation services, that inspired the South Dakota Legislature to pass HB 1219 — Helen's Law — signed by Governor Rhoden on March 9, 2026.

15. **Plaintiff Beverly Larson** is a pro se intervenor in EXNI 453 and a Lakota first-language speaker residing at P.O. Box 82, Wounded Knee, South Dakota 57794.

16. **Plaintiff Ruddell Bear Shirt** is a pro se intervenor in EXNI 453 and a Lakota first-language speaker residing at P.O. Box 88, Wounded Knee, South Dakota 57794.

17. **Plaintiff Seth Eagle Bear, Jr.** is a pro se intervenor in EXNI 453 and a Lakota first-language speaker residing at P.O. Box 44, Wounded Knee, South Dakota 57794.

18. **Plaintiff Darlene Hawk Wing** is a pro se intervenor in EXNI 453 and a Lakota first-language speaker residing at P.O. Box 25, Wounded Knee, South Dakota 57794.

19. **Plaintiff Cheryl Angel** is a pro se intervenor in EXNI 453 residing at 1212 Columbus Street, Rapid City, South Dakota 57701. Plaintiff Angel requested access to interpreter services as needed due to potential language barriers she may encounter during the proceedings.

## B. Defendants

20. **Defendant South Dakota Board of Minerals and Environment** is the state agency responsible for administering the EXNI 453 contested case proceeding. It is a state governmental entity operating under color of state law. It receives federal financial assistance and is subject to Title VI of the Civil Rights Act of 1964.

21. **Defendant South Dakota Department of Agriculture and Natural Resources** (DANR) is the state agency responsible for administering mining and mineral exploration permitting in South Dakota, maintaining the administrative record of the EXNI 453 proceeding, and managing the interpreter services negotiation for the May 18-22, 2026 hearing. It is a state governmental entity operating under color of state law and receives federal financial assistance.

22. **Defendant Bob Morris** is the Hearing Officer in EXNI 453, sued in his official capacity. He denied Plaintiffs' motion for Lakota language interpretation and translation services on November 10, 2025, relying on SDCL § 1-26 and concluding that the intervenors' property interest is "minimal." He has abstained from every substantive vote in EXNI 453, including the March 18, 2026 vote restoring translation services. During the active hearing, he has

declined to rule on live objections, including Plaintiff Lone Eagle's objection to the interference with interpreter Leola One Feather's role, allowing that interference to stand by inaction.

23. **Defendant David McVey** is an Assistant Attorney General of the State of South Dakota assigned as Legal Advisor to the Board of Minerals and Environment, sued in his official capacity. He authored or advised on the denial of interpretation and translation services. He failed to comply with Hearing Officer Morris's direct instruction to collaborate with Plaintiff Lone Eagle on developing a budget and implementation plan for interpreter services — despite that instruction being issued in August 2025. He engaged in a documented pattern of non-responsiveness and obstruction throughout the pre-hearing period. On day two of the hearing, May 19, 2026, he represented to the hearing chair that the Board had approved only "interpreter" services and not "translation" services — a representation directly contradicted by the Board's own official minutes of March 18, 2026. He also, during a recess on day two, accompanied the hearing chair to approach Plaintiff Lone Eagle within the hearing venue and attempted to argue limits on the Fourteenth Amendment and due process rights to a pro se intervenor. On the record during the hearing, he joined in accusing interpreter Leola One Feather of testifying when she was explaining her interpretation process.

24. **Defendant Mike Lees** is the Minerals, Mining, and Superfund Program Administrator for DANR, sued in his official capacity. He conducted the state's interpreter compensation negotiation on terms constitutionally inadequate for the complexity and rarity of Lakota language interpretation in a highly technical legal proceeding. On day one of the hearing, May 18, 2026, he was called as a witness by the state, with Defendant McVey conducting the questioning, in what constituted an attempt to persuade the Board to rescind its own March 18, 2026 ruling. He failed on cross-examination.

25. **Defendant Hunter Roberts** is the Secretary of DANR, sued in his official capacity. He received written notice of every constitutional violation described in this Complaint on April 23, 2026, with a specific request for corrective action before the May 18 hearing commenced. He failed to take adequate corrective action.

26. **Defendant Clean Nuclear Energy Corporation** (CNEC) is named as Real Party in Interest as the permit applicant whose application is the subject of the EXNI 453 contested case proceeding.

## IV. FACTUAL ALLEGATIONS

### A. The EXNI 453 Proceeding and Its Stakes

27. Clean Nuclear Energy Corporation has applied to the Board of Minerals and Environment for a permit to conduct uranium exploration drilling near Craven Canyon in Fall River County, South Dakota, seven miles north of Edgemont. The proposed project would drill up to 50

holes to a maximum vertical depth of 700 feet in an area containing petroglyphs more than 7,000 years old, historical and cultural sites of immense significance to the Oceti Sakowin tribes, and lands that many Lakota people consider sacred.

28. The EXNI 453 contested case proceeding involves approximately 45 intervenors, including numerous Lakota people from the Rosebud and Oglala Sioux Tribes who reside on reservations where access to resources — mail service, transportation, legal assistance, technology — is severely limited. Within the Pine Ridge and Cheyenne River Reservations, there are no fully staffed, fully resourced USPS facilities with the capacity to process filings in compliance with the Hearing Officer's service orders. Intervenors must travel significant distances — often more than an hour to Rapid City — to access adequate postal facilities.

**B. The Request for Interpretation and Translation Services and the Pattern of Denial**

29. On **August 15, 2025**, Plaintiff Lone Eagle filed a motion requesting that the Board enter a procedural order requiring the State to provide, at its expense, Lakota language interpretation and translation services for the benefit of Lakota first-language speaking intervenors and witnesses throughout all phases of the proceeding. The motion identified the need for: (1) spoken language interpretation of motions, orders, exhibits, and other documents; (2) English-to-Lakota translation of in-person proceedings; (3) Lakota-to-English translation of intervenor examinations of witnesses; and (4) Lakota-to-English translation of any testimony provided by witnesses for whom Lakota is their primary language.

30. The legal basis was unambiguous: the Fourteenth Amendment's due process guarantees, reinforced by *Lau v. Nichols*, 414 U.S. 563 (1974); *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Yamataya v. Fisher*, 189 U.S. 86 (1903); *Mathews v. Eldridge*, 424 U.S. 319 (1976); Executive Order 13166; SDCL § 1-26-18; SDCL §§ 45-6B-11 and 45-6B-33; and ARSD 74:09:01:04.

31. At a prehearing conference on August 21, 2025, Hearing Officer Morris held the motion in abeyance and directed Plaintiff Lone Eagle to meet with Defendant McVey to develop a budget and implementation plan for interpreter services, also directing submission of a list of intervenors requiring services and proposed interpreters with their qualifications. Plaintiff Lone Eagle complied fully with both directives, submitting the required materials on August 26, 2025.

32. Plaintiff Lone Eagle left multiple messages for Defendant McVey. The only substantive conversation she ever had with him occurred on September 2, 2025. His primary concerns were cost and hearing-time interpretation only — he expressed no concern for the intervenors' ability to read and understand the hundreds of documents filed in English. Plaintiff Lone Eagle characterized his demeanor as "veiled resistance" — offering only barriers rather than solutions. She received no further cooperation from him or from any state official in developing the plan Morris had directed them to create together.

33. Plaintiff Lone Eagle filed a motion for reconsideration of electronic service, a motion to reconsider and modify the scheduling order, a motion for a protective order on service and deadlines — explicitly citing language barriers as grounds for relief — an addendum documenting Senator Rounds's public confirmation of systemic USPS failures in South Dakota, and a motion for expedited administrative review addressed directly to DANR Secretary Roberts. All were denied, held in abeyance, or received no ruling.

34. On **November 10, 2025,** Hearing Officer Morris denied the motion for Lakota language interpretation and translation services. His written order concluded that SDCL § 1-26 already provides a "meaningful opportunity to be heard" and that "the potential that the intervenors will be deprived of a property right is minimal." He cited *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Application of Farmers State Bank of Viborg*, 466 N.W.2d 158, 162 (S.D. 1991); and *Matter of Est. of Washburn*, 1998 S.D. 11, ¶ 18, 575 N.W.2d 245, 249-50. Morris's characterization of the Lakota-speaking intervenors' property interest as "minimal" — in a proceeding involving uranium exploration in treaty-adjacent territory containing 7,000-year-old cultural sites — will not survive independent judicial review under *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024).

### C. The Legislative Response: Helen's Law

35. The South Dakota Legislature responded directly to the denial of interpretation services in EXNI 453 by passing **HB 1219 — Helen's Law —** requiring the provision of interpreter or translator services for parties to an administrative contested case. Governor Rhoden signed Helen's Law on **March 9, 2026**. It takes effect **July 1, 2026**. The law was passed because the constitutional argument for language access was sound enough to change state law. The Board's own conduct in EXNI 453 created the legislative record that produced it.

### D. The Board's Reversal and the State's Inadequate Response

36. On **March 18, 2026,** the Board of Minerals and Environment voted **8-0** — with Morris abstaining — to overturn Morris's November 10, 2025 denial. The Board's official meeting minutes record the motion as overturning Morris's ruling and proceeding as outlined in HB 1219. The section of the minutes recording this vote is captioned **"Translation Services."** The Board voted to provide translation services. That is what the official record says.

37. The evidentiary hearing originally scheduled for April 13-17, 2026 was rescheduled to May 18-22, 2026, in part because interpretation and translation services were not in place for the original dates — a direct consequence of the state's failure to implement the Board's ruling.

38. Following the Board's March 18 vote, Defendant Lees proposed compensating Lakota interpreters at $43.75 to $61.88 per hour — a rate derived from an informal survey of what South Dakota judicial circuits pay for general interpreter services in commonly spoken languages. That benchmark is constitutionally inadequate for this proceeding. Lakota is a critically endangered language. The interpreters required for EXNI 453 must interpret highly

technical testimony regarding uranium geology, aquifer hydrology, cultural resource law, and administrative procedure in a language for which this technical vocabulary does not exist and must be created in real time.

39. Defendant Lees also proposed a "tag team" structure in which two interpreters would each cover half the hearing day — a structure that cannot produce a continuous and reliable interpretation record, does not account for the gender-based grammatical requirements of the Lakota language, and ignores the cognitive demands of real-time technical interpretation in a critically endangered language.

40. Plaintiff Lone Eagle responded to Defendant Lees's proposal on April 23, 2026, documenting these inadequacies in detail. The state has offered fiscal constraints as justification throughout — while South Dakota carries an approximate $300 million budget surplus, and while Plaintiff Lone Eagle's April 23, 2026 memoranda specifically identified a funding pathway that would not require touching the HB 1219 implementation funds set to take effect July 1, 2026. Citing fiscal feasibility to justify inadequate due process compliance, while carrying a $300 million surplus, is not a defensible policy position.

41. On April 23, 2026, Plaintiff Lone Eagle submitted written memoranda to Governor Rhoden, Attorney General Jackley, DANR Secretary Roberts, and Board Chairman Blumhardt, putting each on direct written notice of every constitutional violation described in this Complaint and the corrective actions required before the May 18 hearing. None produced adequate corrective action.

## E. Cascading Harm from the Prolonged Denial of Services

42. The harm caused by withholding interpretation and translation services from August 2025 through the eve of the May 18, 2026 hearing is not merely prospective. It is historical, structural, and permanent.

43. The September 2, 2025 Scheduling Order established the following deadlines for all intervenors: September 30, 2025 — discovery requests and notices of deposition; October 1, 2025 — briefs on the uranium mining nuisance ordinance; October 14, 2025 — expert witness disclosure; November 10, 2025 — motions to compel; November 17, 2025 — discovery complete; December 1, 2025 — all motions, witness lists, and exhibit lists; December 15, 2025 — responsive briefs; January 6, 2026 — prehearing conference.

44. Because interpretation and translation services were withheld throughout this entire pre-hearing period, Lakota first-language speaking intervenors missed every single one of these deadlines. They could not meaningfully review discovery. They could not understand the documents being filed. They could not prepare witness lists or exhibit lists in a proceeding they could not follow. They could not meaningfully participate in any phase of the pre-hearing process.

45. No accommodation was made. No extension was granted. No deadline was adjusted to account for the language access failure — despite Plaintiff Lone Eagle's explicit, documented requests in her motion to reconsider and modify the scheduling order and her motion for a protective order on service and deadlines, both of which specifically cited language barriers as grounds for relief. Both were denied or ignored.

46. The pre-hearing record in EXNI 453 was built without the meaningful participation of Lakota first-language speaking intervenors. The evidentiary hearing now proceeding is built on that defective foundation.

**F. The Ongoing Hearing — Active Constitutional Violations**

47. **Day One — May 18, 2026:** The state's first act on the opening day of the evidentiary hearing was to call Defendant Lees as a witness to testify regarding his efforts to secure interpretation services, with Defendant McVey conducting the questioning — an attempt to persuade the Board to rescind its own March 18, 2026 ruling, issued two months earlier, following a request pending since August 2025, in response to a denial that was legally wrong from the day it was issued. Defendant Lees failed on cross-examination. The remainder of Day One was consumed by logistical wrangling over interpreter arrangements to satisfy the Board's own ruling. A subpoena ruling was issued just before recess.

48. **Day Two — May 19, 2026:** The hearing chair attempted to begin witness testimony without a translator present. Plaintiff Lone Eagle objected and demanded interpretation for the Lakota-speaking intervenors. When exhibits were subsequently introduced — displayed on screen for the Board and all parties — Plaintiff Lone Eagle objected again because no translations of the exhibits had been provided to Lakota-speaking intervenors. It was this objection that directly prompted Defendant McVey's semantic argument that the Board had approved only "interpreter" services and not "translation" services — a distinction not supported by, and directly contradicted by, the Board's own official minutes of March 18, 2026.

49. **McVey's Misrepresentation of the Board's Own Ruling:** Defendant McVey's semantic distinction between "interpretation" and "translation" — offered in response to Plaintiff Lone Eagle's objection to the denial of exhibit translations — is not a good-faith legal argument. It is a post-hoc characterization of the Board's March 18, 2026 ruling that is directly contradicted by the official record of that ruling. The Board's minutes caption the relevant section **"Translation Services."** If the Board intended to approve only interpretation and not translation, that intent is nowhere reflected in its official record. It is Defendant McVey — not the Board's own minutes — who is making the distinction.

50. **Inadequacy of Services Even as Provided:** Even with interpreter Leola One Feather present, the services provided have proven inadequate for the complexity of the proceeding. During the introduction of exhibits, interpreter Leola One Feather began experiencing difficulty providing real-time translations of the evidence being presented — confirming what Plaintiff

Lone Eagle documented in August 2025 and repeated through April 23, 2026: that the volume, technical complexity, and pace of this hearing require a full team of interpreters, not a single individual working without adequate support or preparation.

51. **Interference with the Interpreter — On the Record:** During the proceedings on day two, the hearing chair and Defendant McVey accused interpreter Leola One Feather of testifying when she was explaining her interpretation process — specifically, how she was rendering certain testimony into Lakota. That accusation was made on the formal record. Plaintiff Lone Eagle objected. The hearing chair declined to rule, moving on without resolution — allowing the interference to stand by inaction. Later in the proceedings, the applicant's attorney made the same accusation against the interpreter. This repeated targeting of the interpreter — by the hearing chair, by the Board's own legal counsel, and by the applicant's attorney — constitutes disparate treatment of the interpreter and the Lakota-speaking intervenors she serves, and directly interferes with the provision of the services the Board itself ordered.

52. **The Recess Exchange — Argumentation Against Constitutional Rights:** During a recess on day two, Plaintiff Lone Eagle requested to speak with the hearing chair regarding the ongoing due process violations. Defendant McVey accompanied the hearing chair to that conversation, which took place inside the hearing venue itself — in the auditorium seating area in front of the stage. The exchange was recorded by outside observer Vonda Long, who recorded it because she believed the approach constituted an attempt to intimidate Plaintiff Lone Eagle. During the exchange, Defendant McVey disputed that the denial of exhibit translations constituted a due process violation and attempted to argue limits on the Fourteenth Amendment and due process rights to a pro se intervenor — outside the formal record, during an active hearing day.

53. **"New for Everyone" — A False Narrative Contradicted by Nine Months of Documentation:** Throughout day one and day two, state officials represented to the hearing chair that this situation is "new" for "everyone" and that they are "trying to figure things out." That representation is false. Beginning in August 2025, Plaintiff Lone Eagle provided Defendants with a detailed, specific implementation plan including: a list of qualified interpreters with credentials; a proposed division of duties and team structure; recommendations for court reporting coordination; recommendations for simultaneous interpretation technology through the South Dakota Department of Tribal Relations; a proposed budget framework; and a request for prompt collaboration with Defendant McVey. She resubmitted, refined, and expanded those materials repeatedly through April 23, 2026. The state has had a complete roadmap for nearly ten months. The claim that it is "figuring things out" on day two of the hearing is not a good-faith acknowledgment of a novel situation. It is a misrepresentation of a documented record.

54. As of day three, May 20, 2026, no transcript has been produced from day one of the hearing — May 18, 2026 — that is accessible to hearing-impaired participants, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.

**G. Law Enforcement Presence and Atmosphere of Intimidation**

55. From the commencement of the EXNI 453 hearing on May 18, 2026, a significant multi-jurisdictional law enforcement presence has been deployed at and around the hearing venue — including state, county, and local officers, as well as individuals believed to be plainclothes law enforcement officers including federal agents. This presence has been maintained throughout both days of the hearing.

56. The law enforcement deployment is understood to be connected, at least in part, to a support camp established in a nearby public park consisting primarily of Lakota enrolled members and their supporters — many of whom cannot afford hotels or restaurants and are present to support the Lakota intervenors participating in a public legal proceeding. The camp is a mix of formally and informally organized participants exercising constitutionally protected rights of assembly and association. At this time, law enforcement contact with the camp itself appears to be limited to surveillance.

57. During the proceedings on day two, when intervenors raised their voices in objection to the ongoing due process violations — not in a disorderly or threatening manner, but in the manner of citizens asserting legal rights in a public proceeding — uniformed officers moved visibly down the aisles of the auditorium toward the intervenors. No disorder had occurred. No conduct warranted a law enforcement response. The movement of officers down the aisles in direct response to intervenors raising objections constitutes an act of visible intimidation directed at Indigenous participants exercising their legal right to participate in a public administrative proceeding.

58. The pattern of multi-jurisdictional law enforcement deployment against Indigenous people opposing extractive energy projects on or near treaty territory is not without precedent. During the 2016 NoDAPL protests at Standing Rock, court documents later revealed that up to ten FBI informants were embedded in protest camps, FBI agents in civilian clothing were regularly sent into the camps, and the Bureau of Indian Affairs operated undercover officers among the water protectors — all in the context of Indigenous people exercising constitutionally protected rights in opposition to an energy project affecting their treaty lands and water. The atmosphere created by the law enforcement presence in Hot Springs bears the hallmarks of that documented pattern: a disproportionate, multi-jurisdictional response to the lawful participation of Native people in a legal proceeding, calibrated to create an atmosphere of surveillance and intimidation rather than to address any genuine public safety concern.

59. This atmosphere of intimidation — visible law enforcement presence, officers moving toward intervenors in response to legal objections, surveillance of a constitutionally protected support camp — has a chilling effect on the willingness and ability of Lakota intervenors and their supporters to fully and freely exercise their rights of participation in these proceedings.

**H. Exhaustion of Administrative Remedies**

60. Plaintiffs have exhausted every available administrative remedy. *See* SDCL § 1-26-30. The motion for interpretation and translation services was filed August 15, 2025. It was held in abeyance, then denied. Plaintiff Lone Eagle filed multiple motions for relief, all denied, held in abeyance, or unanswered. She appealed Morris's denial to the Board on January 19, 2026. The Board voted 8-0 to grant services on March 18, 2026. The state then negotiated services on constitutionally inadequate terms. Written notice of every failure was provided to the Governor, the AG, the DANR Secretary, and the Board Chairman on April 23, 2026. None produced adequate relief. There is no further administrative remedy available. Neither the Department nor the Board has established any written mechanism within ARSD ch. 74:09 to address due process deficiencies during an ongoing contested case. The only theoretical remedy — waiting for final agency action and seeking judicial review — would not provide an adequate remedy because the constitutional injuries being suffered during the live hearing cannot be restored after the fact.

## V. CAUSES OF ACTION

### COUNT I — 42 U.S.C. § 1983: Deprivation of Procedural Due Process

*(Fourteenth Amendment to the United States Constitution; S.D. Const. art. VI, § 2)*

61. Plaintiffs incorporate all preceding paragraphs.

62. The Fourteenth Amendment guarantees that no state shall deprive any person of life, liberty, or property without due process of law. Procedural due process requires a meaningful opportunity to be heard — including the ability to understand the proceeding sufficiently to participate. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Yamataya v. Fisher*, 189 U.S. 86 (1903). SDCL § 1-26-18 guarantees all parties in contested administrative cases the right to present evidence and argument on every issue of fact and law. Those rights are illusory when participants cannot understand the proceeding due to language barriers. ARSD 74:09:01:09 and 74:09:01:10 grant the Board authority to review, correct, or modify hearing procedures to ensure fairness and compliance with due process.

63. Defendants, acting under color of state law, have deprived and continue to deprive Plaintiffs of their procedural due process rights by: conducting EXNI 453 proceedings without adequate Lakota language interpretation and translation services; allowing every pre-hearing deadline to pass without accommodation for Lakota-speaking intervenors; denying Lakota first-language speaking intervenors access to translated exhibits during the active hearing; misrepresenting the Board's own ruling regarding translation services; proceeding with witness testimony without interpretation in place; interfering with the interpreter's ability to perform her role; and declining to rule on live objections to that interference.

64. Under *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024), courts independently evaluate whether agency procedures meet the constitutional standard. The state cannot claim deference for a process that denies meaningful participation to a class of intervenors on the basis of language.

## COUNT II — Title VI of the Civil Rights Act of 1964

*(42 U.S.C. § 2000d; Executive Order 13166)*

65. Plaintiffs incorporate all preceding paragraphs.

66. Title VI prohibits discrimination based on national origin by recipients of federal financial assistance. DANR and the Board receive federal funds and are subject to Title VI. Executive Order 13166 requires recipients of federal financial assistance to take reasonable steps to ensure meaningful access by persons with limited English proficiency. *Lau v. Nichols*, 414 U.S. 563 (1974), established that the mere provision of a resource is not sufficient if that resource does not enable meaningful participation.

67. The denial of adequate language access to Lakota first-language speakers — while English-speaking participants proceed without restriction — constitutes national origin discrimination with a disparate impact on Lakota intervenors in violation of Title VI and its implementing regulations. Defendants have been on notice of this obligation since August 2025 and have failed to remedy it.

## COUNT III — Equal Protection

*(Fourteenth Amendment to the United States Constitution, via 42 U.S.C. § 1983; S.D. Const. art. VI, § 2)*

68. Plaintiffs incorporate all preceding paragraphs.

69. Lakota first-language speakers are being denied the same meaningful access to these proceedings that English-speaking intervenors receive as a matter of course. This disparate treatment is based on national origin and language. The repeated targeting of interpreter Leola One Feather — by the hearing chair, by the Board's legal counsel, and by the applicant's attorney — while no comparable challenge has been directed at any English-language participant, is further evidence of disparate treatment of Lakota-speaking participants. The state has no legitimate justification for this disparity — least of all fiscal constraints refuted by a $300 million surplus and the funding pathway identified in Plaintiff Lone Eagle's April 23, 2026 memoranda.

## COUNT IV — Americans with Disabilities Act

*(42 U.S.C. § 12132)*

70. Plaintiffs incorporate all preceding paragraphs.

71. Title II of the ADA prohibits public entities from denying qualified individuals with disabilities the benefits of their services, programs, or activities. The failure to produce an accessible transcript from day one of the May 18, 2026 hearing denies hearing-impaired participants meaningful access to a public proceeding in violation of the ADA.

## VI. IRREPARABLE HARM

72. The harm being suffered by Plaintiffs is irreparable and compounding with every hour the hearing proceeds:

   • Every pre-hearing deadline has already passed without accommodation — that harm is permanent and cannot be undone;

   • Witness testimony is being taken that Lakota first-language speaking intervenors cannot meaningfully understand or respond to;

   • Exhibits are being entered into the evidentiary record without translation, depriving Lakota-speaking intervenors of meaningful access to the evidence on which the Board will base its decision;

   • Cross-examination opportunities are passing that cannot be restored;

   • Procedural rulings are being issued that Lakota-speaking participants cannot comprehend;

   • The interpreter is being interfered with and accused of testifying when performing her role, without ruling or remedy;

   • The evidentiary record is being built on a constitutionally defective foundation;

   • Hearing-impaired participants have been denied accessible transcripts since day one;

   • The atmosphere of law enforcement intimidation is chilling free and full participation by Lakota intervenors and their supporters.

73. No administrative appeal or post-proceeding remedy can restore what is being lost right now. Every witness examined without interpretation, every exhibit introduced without translation, every deadline that passed without accommodation, and every ruling issued without comprehension is a permanent loss that cannot be undone.

74. The balance of harms weighs overwhelmingly in Plaintiffs' favor. A brief stay imposes administrative delay on Defendants. Failure to grant emergency relief imposes permanent constitutional injury on Plaintiffs — Lakota elders from Wounded Knee who have fought for nearly ten months simply to be heard in their own language in a proceeding that will determine the fate of sacred land and water.

75. The public interest strongly favors relief. The South Dakota Legislature recognized the right to language access in passing Helen's Law. The Board recognized it in its 8-0 vote on March

18, 2026. The only parties resisting it are the state officials whose legal obligation it is to provide it.

## VII. REQUESTED RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.Issue an Emergency Temporary Restraining Order immediately staying all proceedings in EXNI 453 until Defendants demonstrate that constitutionally adequate Lakota language interpretation and translation services are in place for all remaining hearing days;

B.After notice and hearing, issue a Preliminary Injunction maintaining the stay until this Court is satisfied that adequate interpretation and translation services are implemented and operational;

C.Order Defendants to implement a four-person gender-balanced Lakota interpretation and translation team, fully compensated for their full attendance throughout all remaining hearing days, at a rate reflecting the actual complexity and rarity of the services required;

D.Order real-time simultaneous interpretation for all remaining proceedings, utilizing available South Dakota Unified Judicial System technology if obtainable;

E.Order translation of all exhibits, orders, and notices into Lakota for the benefit of first-language speaking intervenors, retroactive to the commencement of the hearing on May 18, 2026;

F.Order that Lakota-speaking intervenors be given adequate time and translated materials to review all pre-hearing filings, exhibits, and orders they were unable to meaningfully access due to the prolonged denial of translation services;

G.Order production of accessible transcripts from all hearing days, including May 18 and May 19, 2026, for hearing-impaired participants;

H.Prohibit Defendants from imposing adverse procedural consequences on Plaintiffs resulting from missed pre-hearing deadlines caused by the denial of language access, or from any prior failures of language access throughout the EXNI 453 proceeding;

I.Order that any testimony taken without adequate interpretation and translation be subject to reopening upon Plaintiffs' request;

J.Order that interpreter Leola One Feather be permitted to perform her role without interference, accusation, or adverse characterization by the hearing chair, Board counsel, or applicant's counsel;

K.Order preservation of all recordings, transcripts, and records from the EXNI 453 proceeding, including the recording made by outside observer Vonda Long during the day two recess on May 19, 2026;

L.Award Plaintiffs their costs in this action; and

M.Grant such other and further relief as this Court deems just and proper.

## VIII. VERIFICATION

I, Elizabeth Lone Eagle, declare under penalty of perjury under the laws of the United States of America that the facts stated in this Complaint are true and correct to the best of my knowledge, information, and belief.

Executed this 20th day of May, 2026.

Elizabeth Lone Eagle

Pro Se Plaintiff

7958 Lakota Prairie Drive, Apartment 53

Kyle, SD 57752

bridgeradvocate@gmail.com

605-200-6800

**NOTARY ACKNOWLEDGMENT**

STATE OF SOUTH DAKOTA)

) ss.

COUNTY OF Fall River )

Subscribed and sworn to before me this 19th day of May, 2026, by Elizabeth Lone Eagle, known to me to be the person whose name is subscribed to the within instrument.

_____

Notary Public   ElaineMatoTamaHece

My commission expires: 3/28/28

(SEAL)

JS 44  (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** *Elizabeth Lone Eagle Et. Al*

**(b)** County of Residence of First Listed Plaintiff *Oglala Lakota*
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

**DEFENDANTS** *SD Board of Minerals and Environment, SD Department of Agriculture and Natural Resources; Bob Maris, David McVey, Mike Cees Hunter Roberts, Clean Nuclear Energy*

County of Residence of First Listed Defendant *Hughes*
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)* *Steven Blair (SD DANR) Matthew Naasz Clean Nuclear Energy Corp*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*          Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
*42 USC § 1983; Title VI of Civil Rights Act 1964; 42 USC § 2000d; 14th Amendment SD Const. art. VI*

Brief description of cause:
*APA 42 USC § 1213(d), Executive order # 13166 §2 Violation of Denial of Due Process rights*

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**    *(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE *May 20, 2026*

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____