UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ELIZABETH LONE EAGLE, <br><br> Plaintiff, <br><br> vs. <br><br> SOUTH DAKOTA BOARD OF MINERALS AND ENVIRONMENT, SOUTH DAKOTA DEPARTMENT OF AGRICULTURE AND NATURAL RESOURCES, BOB MORRIS, IN HIS OFFICIAL CAPACITY AS HEARING OFFICER; DAVID MCVEY, IN HIS OFFICIAL CAPACITY AS LEGAL ADVISOR TO THE BOARD OF MINERALS AND ENVIRONMENT; MIKE LEES, IN HIS OFFICIAL CAPACITY AS MINERALS, MINING, AND SUPERFUND PROGRAM ADMINISTRATOR; HUNTER ROBERTS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF AGRICULTURE AND NATURAL RESOURCES; AND CLEAN NUCLEAR ENERGY CORPORATION, AS REAL PARTY IN INTEREST; <br><br> Defendants. | 5:26-CV-05068-RAL <br><br><br> OPININON AND ORDER DENYING REQUEST FOR TEMPORARY RESTRAINING ORDER |

On May 20, 2026, Plaintiff Elizabeth Lone Eagle[1] filed a pro se Complaint against numerous Defendants, including the South Dakota Board of Minerals and Environment (the Board), the South Dakota Department of Agriculture and Natural Resources (DANR), Hearing

---

[1] Lone Eagle lists six additional plaintiffs in her Complaint, including Helen Red Feather, Beverly Larson, Ruddell Bear Shirt, Seth Eagle Bear Jr., Darlene Hawk Wing, and Cheryl Angel. See Doc. 1 at 4. As explained below, pro se plaintiffs may not assert claims on behalf of others.

1

Officer Bob Morris, Assistant Attorney General and the Board's Legal Advisor David McVey, DANR Administrator Mike Lees, DANR Secretary Hunter Roberts, and Clean Nuclear Energy Corporation (CNEC). Doc. 1. The lawsuit concerns issues with the ongoing administrative proceedings on CNEC's pending uranium exploration permit before the Board and alleges causes of action under 42 U.S.C. § 1983 for deprivation of procedural due process (Count I), Title VI of the Civil Rights Act of 1964 for discrimination based on national origin (Count II), the Equal Protection Clause of the Fourteenth Amendment (Count III), and the Americans with Disabilities Act (ADA) (Count IV). Id. ¶¶ 61–71. Within the Complaint, Lone Eagle includes a request for a temporary restraining order (TRO), "immediately staying all proceedings in EXNI 453 until Defendants demonstrate that constitutionally adequate Lakota language interpretation and translation services are in place for all remaining hearing days." Id. at 15. As Lone Eagle is a pro se litigant, she cannot assert claims on behalf of others, and as she does not have standing to seek the relief she is requesting, the request for the TRO is denied.

## I.    Background[2]

This case involves the accessibility of state administrative hearings before the Board on CNEC's pending uranium exploration permit for an area near Craven Canyon in Fall River County, South Dakota. Doc. 1 ¶ 27. The proposed area of drilling is "in an area containing petroglyphs more than 7,000 years old, historical and cultural sites of immense significance to the Oceti Sakowin tribes, and lands that many Lakota people consider sacred." Id. Approximately 45 intervenors, including numerous Lakota people from the Rosebud and Oglala Sioux Tribes, have filed in the state proceeding on the permit application, EXNI 453. Id. ¶ 28.

---

[2] This Opinion and Order makes no findings of fact but recites the well-pleaded facts in the Complaint relevant to the request for a TRO.

Lone Eagle is an intervenor in EXNI 453 and a second-language Lakota learner.  Id. ¶ 13. Beginning in August 2025, Lone Eagle has consistently requested that the Board provide "Lakota language interpretation services for the benefit of Lakota first-language speaking intervenors and witnesses throughout all phases of the proceedings."  Id. ¶ 29.  On August 15, 2025, Lone Eagle filed a motion with the Board that "identified the need for: (1) spoken language interpretation of motions, orders, exhibits, and other documents; (2) English-to-Lakota translation of in-person proceedings; (3) Lakota-to-English translation of intervenor examinations of witnesses; and (4) Lakota-to-English translation of any testimony provided by witnesses for whom Lakota is their primary language."  Id.

On August 21, 2025, the hearing officer, Morris, held Lone Eagle's motion in abeyance while directing Lone Eagle to meet with McVey to develop a possible plan of action.  Id. ¶ 31. Lone Eagle complied and submitted materials relating to a budget and implementation plan for interpreter services, a list of intervenors requiring services, and proposed interpreters with their qualifications.  Id.  Lone Eagle and McVey had a conversation on September 2, 2025, where McVey expressed concerns over "cost and hearing-time interpretation only" and "expressed no concern" on the intervenors' ability to understanding the English-language filings in the proceeding.  Id. ¶ 32.  Lone Eagle alleges that "[s]he received no further cooperation from him or from any state official in developing the plan Morris had directed them to create together."  Id. Lone Eagle filed multiple motions related to the proceedings' accessibility, see id. ¶ 33, but on November 10, 2025, Hearing Officer Morris denied Lone Eagle's motion for Lakota language interpretation and translation services and "concluded that SDCL § 1-26 [sic] already provides a 'meaningful opportunity to be heard' and that 'the potential that the intervenors will be deprived of a property right is minimal,'" id. ¶ 34.

3

Lone Eagles alleges that in response to the denial of interpretation services in EXNI 453, the South Dakota State Legislature passed Helen's Law, HB 1219, which requires the provision of interpretation or translation services for parties to an administrative contested case. Id. ¶ 35. This law will take effect on July 1, 2026. Id. On March 18, 2026, the Board voted 8-0 to overturn Morris's denial and voted to provide translation services "as outlined in HB 1219." Id. ¶ 36. The original dates for the administrative evidentiary hearing on the permit had to be rescheduled in part because the interpretation and translation services were not yet in place. See id. ¶ 37. Following the Board's decision to provide interpretation services, Lees prepared a proposal to implement the decision, which Lone Eagle responded to in order to highlight what she felt were inadequacies with the proposal. Id. ¶¶ 38–40. Lone Eagle also "submitted written memoranda to Governor Rhoden, Attorney General Jackley, DANR Secretary Roberts, and Board Chairman Blumhardt, putting each on direct written notice of every constitutional violation described in this Complaint and the corrective actions required before the May 18 hearing," but "[n]one produced adequate corrective action." Id. ¶ 41. Lone Eagle alleges that the lack of interpretation and translation services for this period between her August 2025 request and the May 2026 evidentiary hearings inhibited meaningful participation from intervenors who are first-language Lakota speakers in the pre-hearing proceedings on the permit application. See id. ¶¶ 42–46.

The evidentiary hearings were scheduled to last for five days and began on May 18, 2026. Id. ¶¶ 2, 47. The first day focused entirely on interpretation-related issues. See id. ¶ 47. On the second day of the evidentiary hearing, May 19, "[t]he hearing chair attempted to begin witness testimony without a translator present," and Lone Eagle objected and asked for the interpreter to be present. Id. ¶ 48. Exhibits were then introduced that had not been translated into the Lakota language. Id. When Lone Eagle objected again, McVey countered that "the Board had approved

4

only 'interpreter' services and not 'translation' services," which Lone Eagle contests as inaccurate. Id. However, there was one interpreter, Leola One Feather, present at the evidentiary hearing. Id. ¶ 50. Lone Eagle alleges numerous issues with having a single interpreter present "without adequate support or preparation." Id. The interpreter was later accused of testifying into the record by the hearing chair and McVey. Id. ¶ 51.

Lone Eagle then made additional objections on due process violations during a recess. Id. ¶ 52. Lone Eagle expresses frustrations within her Complaint with state officials' excuses about the novelty of providing Lakota interpretation services as Lone Eagle had prepared a detailed implementation plan as early as August 2025. Id. ¶ 53. Lone Eagle further contests that no transcript has been provided to hearing-impaired intervenors, which she alleges is a violation of the ADA, and that heavy law enforcement presence during the hearings have created an "atmosphere of intimidation," which in turn has "a chilling effect on the willingness and ability of Lakota intervenors and their supporters to fully and freely exercise their rights of participation in these proceedings." Id. ¶¶ 54–59.

Lone Eagle now requests that this Court enjoin the evidentiary hearing proceedings in EXNI 453 for the final days "until Defendants demonstrate that constitutionally adequate Lakota language interpretation and translation services are in place for all remaining hearing days." Id. at 15. Lone Eagle provides that she and the six Plaintiffs she has asserted claims on behalf of are suffering irreparable harm, including that every prehearing deadline has passed without language accommodations, testimony and exhibits are being entered into the administrative record that Lakota first-language speaking interventors cannot meaningful understand or respond to, cross-examination opportunities are passing that cannot be restored, rulings are being issued that Lakota speakers cannot comprehend, the interpreter's role is being interfered with, the evidentiary record

is being built on a constitutionally defective foundation, hearing-impaired participants have not

been provided with transcripts, and law enforcement is chilling participation. See id. at 14.

## II.    Legal Standards

### A.  Temporary Restraining Order

Rule 65(b)(1) and (2) of the Federal Rules of Civil Procedure provide as follows:

(b) **Temporary Restraining Order**.

> (1) **Issuing Without Notice**. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>>
>> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
>
> (2) **Contents; Expiration**. Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

Fed. R. Civ. P. 65.

"A district court considering injunctive relief evaluates [a] the movant's likelihood of success on the merits, [b] the threat of irreparable harm to the movant, [c] the balance of the equities between the parties, and [d] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Turtle

6

Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted). The focus in considering a temporary restraining order is whether the moving party "clearly show[s] that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

### B. Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Murthy v. Missouri, 603 U.S. 43, 56 (2024); see also Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" FDA v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024) (quoting Allen v. Wright, 468 U.S. 737, 760 (1984)). Courts implement this limit through different justiciability doctrines, including standing and ripeness. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

Broadly speaking, the standing inquiry concerns whether the plaintiff is the appropriate party to bring a particular suit. Raines v. Byrd, 521 U.S. 811, 818 (1997); Flast v. Cohen, 392 U.S. 83, 99–100 (1968). The three requirements for standing are (1) an injury in fact, (2) a causal connection between the injury and the challenged law, and (3) a likelihood that a favorable decision will redress the injury. All. for Hippocratic Med., 602 U.S. at 380; Animal Legal Def. Fund v. Vaught, 8 F.4th 714, 718 (8th Cir. 2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). Standing is jurisdictional, requiring a federal court to consider all standing defects, even those parties may overlook. See Young Am.'s Found., 14 F.4th at 887 (requiring the court raise the "threshold issue" of standing "sua sponte if need be" (cleaned up and citations omitted)).

7

To satisfy Article III standing, an injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (cleaned up and citation omitted). A "concrete" injury means "that it must be real and not abstract." All. for Hippocratic Med., 602 U.S. at 381. A "particularized" injury means that it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." Id. (quoting Lujan, 504 U.S. at 560 n.1). "Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." Id. "Ordinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party." Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec., No. 26-CV-749, --- F. Supp. 3d ---, 2026 WL 404457, at *8 (D. Minn. Feb. 12, 2026) (quoting Barrows v. Jackson, 346 U.S. 249, 255 (1953)).

The Supreme Court of the United States has recognized that the "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" All. for Hippocratic Med., 602 U.S. at 380 (citation omitted). Causation requires a plaintiff to show an "injury likely was caused or likely will be caused by the defendant's conduct." Id. at 382. "[T]he causation requirement screens out plaintiffs who were not injured by the defendant's action." Id. at 383. For causation, "the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." Id. at 385. Where the defendant's action caused injury, redressability—the third element of standing—typically exists through injunctive action or an award of damages. Id. at 381.

A plaintiff bears the burden of establishing standing as of the time the lawsuit was brought and throughout the pendency of the case. See Carney v. Adams, 592 U.S. 53, 59 (2020).

"[S]tanding is not dispensed in gross," <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 431 (2021), but requires a plaintiff to "demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek," <u>Murthy</u>, 603 U.S. at 61 (cleaned up and citation omitted). "Because these requirements are 'an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e* , with the manner and degree of evidence required at the successive stages of litigation.[']" <u>Young Am.'s Found.</u>, 14 F.4th at 887 (quoting <u>Bernbeck v. Gale</u>, 829 F.3d 643, 646 (8th Cir. 2016)). "

### III.    Analysis

As standing is jurisdictional, this Court turns to analyze Lone Eagle's standing to request a TRO first, or in other words, whether she is the appropriate party to bring this particular suit. <u>See</u> <u>Young Am.'s Found.</u>, 14 F.4th at 887 (requiring the court raise the "threshold issue" of standing "sua sponte if need be"); <u>Raines</u>, 521 U.S. at 818; <u>Flast</u>, 392 U.S. at 99–100. "To allege an 'injury in fact' that confers standing to seek injunctive relief, a plaintiff must face a threat of ongoing or future harm." <u>ARRM v. Piper</u>, 319 F. Supp. 3d 1156, 1160 (D. Minn. 2018) (citing <u>Park v. Forest Serv. of the U.S.</u>, 205 F.3d 1034, 1037 (8th Cir. 2000)); <u>see also</u> <u>Allnew v. City of Duluth</u>, 983 F. Supp. 825, 833 (D. Minn. 1997) (reviewing plaintiff's standing to obtain a temporary restraining order) ("Expressed somewhat more fully, 'the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498–99 (1975) (cleaned up and internal citation omitted))). Lone Eagle seeks immediate injunctive relief on behalf of herself and six other

plaintiffs and has alleged numerous kinds of irreparable harm on their collective behalf. See Doc. 1 at 14.

However, Lone Eagle is a pro se plaintiff, and she is the only one to have signed the Complaint. Id. at 16. "Under Rule 11(a) of the Federal Rules of Civil Procedure, each pro se party in the case must sign the complaint in order to properly bring this action before the Court." Monroe v. Yankton Sioux Hous. Auth., No. 4:25-CV-04113, 2025 WL 1795824, at *2 (D.S.D. June 30, 2025) (quoting Clay v. Purkett, No. 06-CV-1859, 2007 WL 107758, at *1 (E.D. Mo. Jan. 9, 2007)); see also Ortiz-Diaz v. Social Sec., No. 17-CV-7532, 2018 WL 791256, at *2 (E.D.N.Y. Feb. 7, 2018) (citing Rule 11(a) for the proposition that "[a]ll pro se plaintiffs in a lawsuit must sign the complaint"). Further, while a pro se plaintiff may plead their own case in federal court under 28 U.S.C. § 1654, a pro se plaintiff cannot bring claims on behalf of others. See Johnson v. Precythe, No. 2:19-cv-00010, 2019 WL 931925, at *1 (E.D. Mo. Feb. 26, 2019). Therefore, Lone Eagle can only assert claims on her own behalf, and this Court will only look to whether her allegations establish an injury-in-fact that grants her standing to pursue the requested TRO.

Lone Eagle's allegations do not establish an injury in fact conferring standing to seek injunctive relief because she does not herself "face a threat of ongoing or future harm." ARRM, 319 F. Supp. 3d at 1160 (citing Park, 205 F.3d at 1037). As noted above, an injury in fact must be "particularized," meaning that it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." All. for Hippocratic Med., 602 U.S. at 381 (quoting Lujan, 504 U.S. at 560 n.1). Lone Eagle has admirably petitioned for greater accessibility on behalf of many intervenors who are first-language Lakota speakers. However, Lone Eagle is herself a second-language Lakota learner and has not pleaded any allegations, as they relate to the request for the TRO to enjoin the hearings until adequate Lakota language interpretation and translation services

10

are in place, concerning her own ability to understand the proceedings because of a language barrier (or hearing impairment). See Doc. 1 ¶ 13; Ehrich v. Credit Prot. Ass'n, L.P., 891 F. Supp. 2d 414, 416 (E.D.N.Y. 2012) (concluding plaintiff had not met his burden to establish standing where he "suffered no actual injury stemming from [an] allegedly illegal collection notice" because he "speaks no Spanish" and "thus could not have been misled by the Spanish phrases in the collection notice," and "[t]he possibility that the collection notice's limited use of Spanish might mislead a debtor who speaks only Spanish is immaterial to the issue of [his] standing in this case"). For these reasons, Lone Eagle has not alleged an injury in fact necessary to establish Article III standing to obtain the injunctive relief requested.

Because Lone Eagle has not satisfied her burden to demonstrate that the injuries alleged are particularized to her as opposed to a generalized grievance, Lone Eagle lacks Article III standing to request this relief, and this Court does not proceed to analyze the request for the TRO under Rule 65 and the Dataphase factors. See ARRM, 319 F. Supp. 3d at 1162 (citing Fed. R. Civ. P. 12(h)(3)) (dismissing claim for TRO); Allnew, 983 F. Supp. at 834–35 (denying TRO for lack of standing).

11

## IV.    Conclusion

For the foregoing reasons, it is hereby

ORDERED that the Plaintiff Elizabeth Lone Eagle's request for a temporary restraining order is denied.

DATED this 21st day of May, 2026.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE